UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHEAP EASY ONLINE
TRAFFIC SCHOOL; BORNA
MOZAFARI AND MARLA
KELLER AS TRUSTEES FOR
CHEAP EASY ON-LINE
TRAFFIC SCHOOL PENSION
PLAN; BORNA MOZAFARI AS
TRUSTEE FOR THE CHEAP
EASY ON-LINE PROFIT
SHARING PLAN; EASY ON
LINE TRAFFIC SCHOOL.COM,
INC.; MARLA KELLER AS
TRUSTEE FOR THE MARLA
KELLER PENSION PLAN AND
MARIA KELLER 401(K) PLAN,

                              Plaintiffs,

v.

PETER L. HUNTTING & CO.,
INC.;  SMI PENSIONS;
SHEFFLER CONSULTING
ACTUARIES INC.; ESTATE OF
PETER L. HUNTTING; MIKE
EDWARDS; WILLIAM
SHEFFLER; ECONOMIC
GROUP PENSION SERVICES
GROUP, INC.; and DOES 1 to
100, inclusive ,

                              Defendants.

Case No.:  16cv2644-WQH-MSB

**ORDER**

HAYES, Judge:

        The matters before the Court are the four motions for summary judgment filed by
Defendants.  (ECF Nos. 46, 47, 48, 50).

## I.    PROCEDURAL BACKGROUND

On September 13, 2017, Plaintiffs Cheap Easy Online Traffic School; Borna Mozafari and Marla Keller, as Trustees for Cheap Easy On-Line Traffic School Pension Plan; Borna Mozafari, as Trustee for the Cheap Easy On-Line Profit Sharing Plan; Easy On Line Traffic School.Com, Inc.; and Marla Keller, as Trustee for the Marla Keller Pension Plan and Marla Keller 401(K) Plan filed the First Amended Complaint, the operative complaint in this action.  (ECF No. 34).  Plaintiffs allege that Defendants, who provided actuarial and administrative services in connection with the Plans, breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA).  Pub. L. 93-406, 88 Stat. 829 (codified as amended in various sections of 29 U.S.C.).  Plaintiffs allege that the Defendants' recommendations resulted in overfunding of the Plans and termination of the Plans.  Plaintiffs allege that the Defendants' conduct caused Plaintiffs significant excise and income tax damages.  Plaintiffs additionally bring state law claims arising from Defendants' conduct in relation to the Plans.  (ECF No. 34).

On March 15, 2018, Defendants SMI Pensions, Sheffler Consulting Actuaries, Inc., and William Sheffler (collectively, Sheffler) filed a Motion for Summary Judgment (ECF No. 46) supported by a Separate Statement of Undisputed Material Facts.[1]

On March 15, 2018, Defendants Estate of Peter L. Huntting and Peter L. Huntting & Co., Inc. (collectively, Huntting) filed a Motion for Summary Judgment.  (ECF No. 47).

On March 15, 2018, Defendant Mike Edwards (Edwards) filed a Motion for Summary Judgment.  (ECF No. 48).

On March 16, 2018, Defendant Economic Group Pension Services Group, Inc. (EGPS) filed a Motion for Summary Judgment.  (ECF No. 50).

On April 3, 2018, Plaintiffs filed an Opposition (ECF No. 57) to the EGPS Motion.

---

[1] Sheffler, Huntting, and Edwards have submitted identical Separate Statements of Undisputed Material Facts.  (Sheffler, ECF No. 46-2; Huntting, ECF No. 47-2; Edwards and Am. Edwards, ECF Nos. 48-3, 49).  The Edwards Amended Statement modified only the attorney caption.

On April 3, 2018, Plaintiffs filed Oppositions (ECF Nos. 54–55) to the Sheffler and Huntting Motions, and on April 4, 2018, Plaintiffs filed an Opposition (ECF No. 59) to the Edwards Motion. The Oppositions were supported by responses to the Sheffler, Huntting, and Edwards Separate Statements of Undisputed Material Facts (ECF Nos. 54-1, 55-1, 59-1) and a declaration by Adrienne Knauer (ECF Nos. 54-8, 55-8, 59-8).[2]

On April 9, 2018, all Defendants filed replies (Edwards, ECF No. 60; Sheffler, ECF No. 62; Huntting, ECF No. 64; EGPS, ECF No. 66) supported by identical objections to the Knauer declaration (ECF Nos. 61, 63, 65, 67).

On April 13, 2018, Plaintiffs filed identical replies to Defendants' objections to the Knauer declaration. (ECF Nos. 71–74). Plaintiffs also filed identical evidentiary objections to the Sheffler, Huntting, and Edwards SSUFs.[3] (ECF Nos. 75–77).

## II. FACTS

Plaintiffs Borna Mozafari and Marla Keller own online traffic school businesses. Mozafari owns Plaintiff Cheap Easy On-Line Traffic School (CEOLTS). Keller owns Plaintiff Easy On-Line Traffic School.com, Inc. (EOLTS). (Mozafari Decl., ECF No. 55-2 at 2).[4]

As early as 2001, Mozafari and Keller retained Huntting for retirement plan services, and to create the Cheap Easy On-Line Traffic School Pension Plan (CEOTS Pension Plan), the Cheap Easy On-Line Profit Sharing Plan (Cheap PSP), the Marla Keller 401(k) Plan

---

[2] ECF Nos. 54-1, 55-1, and 59-1 are identical. For purposes of this Order, the Court refers to ECF No. 55-1 for Plaintiffs' responses to the Sheffler, Huntting, and Edwards Separate Statements of Material Facts.

[3] Plaintiffs state, "All of the Separate Statements of Undisputed Facts of the above-identified Defendants are identical, as are these Evidentiary Objections. However, Plaintiffs will file a separate Evidentiary Objection pleading (albeit with the same caption) for each of the Motions for Summary Judgment for the identified Defendants." (ECF No. 75 at 2; ECF No. 76 at 2; ECF No. 77 at 2).

[4] The same Borna Mozafari declaration and exhibits support all of Plaintiffs' Oppositions and responses to the Sheffler, Huntting, and Edwards SSUFs. (ECF Nos. 54-2 to 54-3; ECF Nos. 55-2 to 55-3; ECF Nos. 57-2 to 57-3; ECF Nos. 59-2 to 59-3).

(Keller 401(k) Plan), and the Marla Keller Pension Plan (Keller Pension Plan)—collectively, the Plans. (Pl.'s Resp. to Sheffler, Huntting, and Edwards SSUFs, ECF No. 55-1 ¶¶ 1, 5; Ex. 4 to Sheffler Decl., ECF No. 46-7 at 2, 4).[5] Keller and Mozafari are the named Trustees of the CEOTS Pension Plan, the Keller Pension Plan, and the Keller 401(k) Plan. (ECF No. 55-1 ¶¶ 30, 32–33). Mozafari is the named Trustee of the Cheap PSP. *Id.* ¶ 31.

A 2004 engagement agreement between Mozafari and Huntting includes the following language:

> We perform the following consulting and recordkeeping services on an annual basis:
>
> 1. Prepare a Plan Review, which includes the following:
>    a.   Balance Sheet and Statement of Fund Transactions;
>    b.   Account Allocations or Actuarial Report, with Participant Statements;
>    c.   Summary Annual Report for the Department of Labor;
>    d.   Annual Return/Report Form 5500 series and related schedules, except for the independent CPA audit required for plans with participants in excess of 100.
> 2. Determine the eligibility of reported employees.
> 3. Provide the contribution range,
> 4. Perform testing necessary to determine limitations on contributions.

---

[5] At the time Plaintiffs filed Opposition papers, the hearing was scheduled for April 16, 2018. All Opposition papers were due April 2, 2018. *See* S.D. Cal. Civ. R. 7.1(e)–(f) ("The opposition must contain a brief and complete statement of all reasons in opposition to the position taken by the movant."). On April 13, 2018, Plaintiffs filed identical evidentiary objections to the separate statement of undisputed facts filed by Edwards, the Sheffler Defendants, and the Huntting Defendants. (ECF No. 75–77). Plaintiffs assert that the objections are "intended as threshold inquiries as to the evidentiary sufficiency of Defendants' purported Undisputed Facts." Plaintiffs assert that sustained objections control whether there is a genuine issue of material fact and that, for overruled objections, Plaintiffs' previously filed responses to Defendants' separate statements of undisputed fact control. *See, e.g.*, ECF No. 75 at 2. Defendants have not filed any response to Plaintiffs' evidentiary objections.

The Court need not consider the untimely evidentiary objections. *See Nguyen v. Marketsource, Inc.*, No. 17-CV-02063-AJB-JLB, 2018 WL 2182633, at *3 (S.D. Cal. May 11, 2018) (citing *Elliot v. Spherion Pac. Work, LLC*, 368 F. App'x 761, 763 (9th Cir. 2010) (concluding district court did not abuse discretion for refusal to rule on untimely evidentiary objections)). The Court has considered only admissible evidence in this matter. *See Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006) (citing *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002)).

5. Provide general consultation on Plan matters as needed. Additional fees may be necessary and will be quoted upon request.

6. We **do not** prepare Forms 1099-R as a part of our annual service. We do provide that service at an additional cost. The IRS requires that a Form 1099-R be provided to each participant that received a distribution in any calendar year.

Our work is based upon representations made by you, your employees and designated agents, which may include your accountant, legal counsel or investment advisor. As such, our services cannot be relied upon to disclose errors or irregularities that may exist, including fraud or other illegal acts. The scope of this agreement does not include legal, accounting, tax or investment advice; ***We do not, and will not, act as Fiduciary or Plan Administrator to the Plan in any capacity.*** We will, however, inform you of any apparent irregularities which may arise during our limited review.

(Ex. 4 to Sheffler Decl., ECF No. 46-7 at 2). Engagement agreements corresponding to the years 2005, 2011, and 2012 contain similar language. (Exs. 5–9 to Sheffler Decl., ECF Nos. 46-7 to 46-12). Pursuant to the agreements, Huntting "obtained an Employer Identification Number, created plan documents, the Board resolutions and meeting minutes, and prepared and filed all required IRS tax returns and other governmental filings on behalf of each of the Plans when authorized to do so." (ECF No. 55-1 ¶ 7).

By 2005, Huntting had "retained Sheffler to prepare an annual IRS filing, Schedule SB to Form 5500, as the enrolled actuary for each of the Plans." *Id.* ¶ 19; Ex. 39 to Sheffler Decl., ECF No. 46-42 at 2. Sheffler calculated, and Huntting provided to Plaintiffs, "recommended contribution[s]" in order "to fun[d] the Plans." *Id.* ¶ 8. Invoices from Sheffler to Huntting between 2005 and 2014 list billings for tasks including: "Review and summarize the plan and amendments," "Review employee census to determine participation dates for new entrants," "Review appropriateness of funding method and actuarial assumptions," "Reconcile plan investment accounting," "Compute yield on invested assets and actuarial value of trust assets," "Calculate total plan liabilities, unfunded supplemental liability, and present value of future employer contributions," "Compute full funding limits for the current year," "Estimate the plan cost allocation for

each participant," "Prepare an exhibit of minimum required contribution and maximum deductible contribution," "Compute current and projected retirement benefits for each participant," "Compute accrued benefits and vesting amounts for each participant," "Prepare and execute Form 5500 Schedule SB," "Estimate maximum deductible contribution and minimum required contribution for the following year," and "Prepare actuarial funding recommendation for the current and following year." (Ex. 39 to Sheffler Decl., ECF No. 46-42 at 2–17).

Between 2005 and 2014, "Sheffler did not speak with Mozofari or Keller in person or through any other form of communication," and Huntting provided Sheffler with the information necessary for Sheffler's recommendations. *Id.* ¶ 10. Once Sheffler provided Huntting with recommendations for the Plans, "Huntting would eventually pass" the recommendations "on to Mozafari and Keller." *Id.* ¶ 11. "Plaintiffs sought to contribute the maximum amount to the Plans that could be tax deductible." *Id.* ¶ 13. The Boards of Directors of EOLTS and CEOTS "had the authority to determine the desired contribution amount" to the respective Plans. *Id.* ¶ 14.

A 2009 email from Huntting to Keller states,

> Based on the data you provided, you could contribute up to an additional $184,000 to your pension plan and Borna could contribute up to an additional $142,000 to his plan. While this will not make up the entire loss, it would bring the plans to approximately 100% of their current funding level.
> Before you do anything on this, you should talk with your CPA to determine the impact on your corporations taxes. Any additional contributions are not due until the due date of the corporate tax returns.

(Ex. 5 to Keller Decl., ECF 55-5 at 7). A 2010 email from Huntting to Keller states,

> On Borna's Pension Plan, the plan assumption for investment income is 5% annually. In 2009, the plan had investment gains of 27%, thus this puts the plan in a situation where it is currently overfunded by approximately $123,000 going into the 2010 plan year. Because of this, at this time I must limit the contribution to the Cheap Easy On-Line Traffic School Pension plan for 2010 to $57,300. On your plan, the same thing has happened. You had a 24% gain in 2009 and that put your plan also in an overfunded status, therefore, I must

limit you at this time to the $50,000 you have already contributed. Once we have both your year end valuations completed and we have the 2010 segment rates the IRS publishes, we will be able to give you a better picture.

. . . .

TAX ADVI[C]E DISCLOSURE: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advi[c]e contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code . . . .

*Id.* at 4.  A 2011 email from Huntting to Keller and Mozafari states,

The following are the 2011 maximum contributions to your Pension Plans[:]
Marla Keller's Pension Plan      $118,000
Marla Keller's 401 k Plan        $16,500-Marla; $22,000-Borna
Borna's Pension Plan             $161,500

*Id.* at 5.  A 2011 letter from Huntting to Mozafari states, "The minimum required contribution for the 2011 Plan Year will be Zero. The maximum projected contribution for the 2011 Plan Year is $161,500 depending on the plans investment experience in 2011." *Id.* at 6.  The letter also states that "[p]rior to 2008, we have had the option of using a number of Actuarial methods in calculating minimum and maximum contributions, however that has now been taken away from us and we are required to use a method determined by the IRS." *Id.*

Edwards began to work for Huntting in May 2011, as an at-will employee, without a written employment agreement. *Id.* ¶ 39.  Edwards assisted with providing services to Huntting's clients, which included interacting with Keller and Mozafari. *Id.* ¶¶ 42–43.

Huntting "filed the annual returns and related governmental filings for the Plans with the government on behalf of the respective Plan Administrator of each of the Plans only when expressly authorized by such Plan Administrator to do so." *Id.* ¶ 20.  "[T]he required governmental filings and annual returns prepared by [Huntting] were executed by Mozafari" or Keller "as Plan Administrator" under penalty of perjury. *Id.* ¶ 22.  A 2010

invoice from Huntting to Plaintiffs bills for: "Determination of eligible employees and vesting percentages," "Determination of Key Employees," "Determination of Benefits payable to Terminated Participants," "Preparation of Plan Financial Statements," "Top Heavy Testing," "Minimum Contribution Testing," "Preparation of Participant Actuarial Valuation (including projection of monthly benefits, cash at retirement & accrued benefits; calculation of present values & funding standard account)," "Preparation of Form 5500-SF, Schedule SB and Form 5558 - Extension of time to file," "Preparation and Filing of PBGC Form I and related Schedules," "Preparation of 'Summary Annual Report,'" and "Preparation of Participant Statement." (Ex. 4 to Keller Decl., ECF 55-5 at 2).

The CEOTS Pension Plan and Keller Pension Plan became overfunded by 2014. *Id.* ¶ 49. On November 4, 2014, Huntting met with Plaintiffs to discuss the overfunding. (Mozafari Decl. ¶ 25, ECF No. 55-2). In a letter dated November 4, 2014, Huntting informed Mozafari "it appears that your Plan is at a point where it is fully funded and can no longer absorb any more contributions as it is actually over-funded." (Ex. 46 to Sheffler Decl., ECF No. 46-49; Ex. 2 to Mozafari Decl., ECF No. 55-3 at 4). The letter continues,

> What I am going to recommend is to terminate the Pension Plan immediately and roll the Plan ETrade Investments over to your Profit Sharing Plan as a designated Qualified Replacement Plan. You would be able to continue contributing to the Profit Sharing Plan as you have the past couple years, up to a maximum of $52,000 for 2014. This arrangement would also allow the Plan to allocate a portion of the over-funding to your account each year. If we do not do this, you will not be able to make any further contributions to the Pension Plan and the over-funding will continue to grow each year and would eventually come back to the Corporation. This reversion to the Corporation would then be double taxed thus wiping it almost out completely.

*Id.*

On November 4, 2014, the CEOTS Board of Directors executed a Resolution "to terminate the CEOTS Pension Plan, signed by Mozafari as corporate Secretary." (ECF No. 55-1 ¶ 53). Also on November 4, 2014, the EOLTS Board of Directors executed a Resolution "to terminate the Keller Pension Plan, signed by Keller as corporate Secretary."

*Id.* ¶ 54. Both resolutions provided that any undistributable assets remaining in the pension plans would transfer to a "Qualified Replacement Plan"—the Cheap PSP for the CEOTS Pension Plan, and the Keller 401(k) plan for the EOLTS Pension Plan. *Id.* ¶¶ 55–56.

On November 11, 2014, Keller executed and signed certain IRS documents to further the termination of the Keller Pension Plan and did not file for an IRS favorable Letter of Termination. *Id.* ¶ 58. The same day, Mozafari directly rolled over all CEOTS Pension Plan assets into the Cheap PSP, and Keller directly rolled over all Keller Pension Plan assets into the Keller 401(k) Plan. *Id.* ¶¶ 59–60.

On November 18, 2014, Mozafari, as Plan Administrator, signed a "Termination Notice" with the Pension Benefit Guaranty Corporation (PBGC). *Id.* ¶ 61. Mozafari certified in the PBGC form that he had not and would not file for an IRS determination letter on the termination of the CEOTS Pension Plan. *Id.* ¶ 62. "On November 20, 2014, Keller assigned, transferred, and set over all assets in the Keller Pension Plan E-Trade Financial Portfolio . . . to the Keller 401(k) Plan." *Id.* ¶ 28. Keller and Mozafari signed the checks to physically move the plan assets to the Keller 401(k) Plan and the Cheap PSP. *Id.* ¶¶ 64–65.

On December 5, 2014, Huntting passed away. *Id.* ¶ 66. After Huntting passed, "Edwards considered Sheffler his boss, and treated him that way." (ECF No. 55-1 ¶ 75).

In February 2015, pursuant to a 1992 buyout agreement between Sheffler and Huntting, Sheffler purchased the assets of Huntting's business in February 2015. *Id.* ¶¶ 67–68, 77. Sheffler hired Edwards in February 2015 as an at-will employee, "pursuant to a written employment agreement," and Sheffler was Edwards' boss. *Id.* ¶ 78–79. In 2015, Edwards sent Keller and Mozafari letters regarding the Plans, signing his name as "Plan Administrator." (Ex. 8 to Keller Decl., ECF No. 55-5 at 15).

After Huntting's death, "Sheffler continued the process of terminating the CEOTS Pension Plan and Keller Pension Plan." (ECF No. 55-1 ¶ 84). Sheffler prepared distribution forms for Mozafari and Keller to give "CEOTS and EOLTS employees respectively." *Id.* ¶ 85. After reviewing the distribution forms, Mozafari and Keller

received instructions for making the distributions. *Id.* ¶ 86. "On April 23, 2015, Mozafari sent a Notice of Plan Benefit letter," to inform all CEOTS employees of the distribution and explain "how to receive a distribution." *Id.* ¶ 87. "[O]nly Mozafari and Keller, as Trustees, had authority to write checks for the Plans." *Id.* ¶ 88.

On September 25, 2015, Keller gave Sheffler permission to electronically file the 2014 Form 5500 for the Keller Pension Plan. *Id.* ¶ 92. On October 13, 2015, Mozafari gave Sheffler permission to electronically file the 2014 Form 5500 for the CEOTS Pension Plan. *Id.* ¶ 93. Between September and November 2015, Sheffler sent Mozafari and Keller 2014 Annual Reviews for the Cheap PSP, the Keller 401(k) Plan, and the CEOTS Pension Plan. *Id.* ¶¶ 94–97. "Sheffler continued to instruct Mozafari and Keller on how to communicate with CEOTS and EOLTS employees about benefit distributions"; specifically, Sheffler's employee Elizabeth Buckles emailed Mozafari and Keller on November 25, 2015, "explaining how to distribute benefits owed to terminated employees of the Cheap PSP and CEOTS Pension Plan." *Id.* ¶ 98. Buckles explained that Mozafari would contact the terminated employees and "provide these employees with the required forms to carry out the benefit distributions." *Id.* ¶ 99. "Mozafari would then draft a letter to the terminated CEOTS employees informing them of their distribution and how to receive a distribution." *Id.* ¶ 100. Sheffler provided services to Mozafari and Keller until July 2016. *Id.* ¶ 83. On July 25, 2016 EGPS bought "substantially all of the assets" of Sheffler's businesses. (Pl.'s Resp. to EGPS SSUF, ECF No. 57-1 ¶ 7). [6]

## III. HUNTTING (ECF No. 47), SHEFFLER (ECF No. 46), AND EDWARDS (ECF No. 48) MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions

Huntting, Sheffler, and Edwards (Defendants) contend that the undisputed facts support the conclusion that they acted as actuaries and third-party administrators

---

[6] EGPS provides a different statement of undisputed fact than Edwards, Sheffler, and Huntting.

performing usual professional functions, not as fiduciaries. (ECF Nos. 46–48). Defendants contend that the undisputed facts show that they did not exercise discretionary authority or control in the management of the Plans, discretionary authority or responsibility over plan administration, or control in the management or disposition of the Plans' assets. Defendants assert they offered no investment advice for a fee, and had no authority or responsibility to render investment advice.

Plaintiffs contend that Defendants' superior knowledge and influence gave them effective control over the Plans, and all material decisions of plan management and administration—"including, but not limited to annual funding amendments re benefit calculations, the creation of the overfunding, and the decision to terminate and roll over the Plans." (ECF No. 54 at 14; ECF No. 55 at 13–14; ECF No. 59 at 13). Plaintiffs assert that "throughout the relationship between Defendants and Plaintiffs," Defendants "fail[ed] to provide [Plaintiffs] with enough information to make an informed decision." (ECF No. 54 at 15; ECF No. 55 at 15; ECF No. 59 at 15). Plaintiffs contend that Edwards' failure to advise Plaintiffs on their "controlled group" status subjects Edwards to functional fiduciary liability. (ECF No. 59 at 14). Plaintiffs assert that Defendants provided investment advice and instructed Plaintiffs on Plan investments. Plaintiffs contend that functional fiduciary status equitably attaches to Defendants because Huntting represented that he and his team, including Sheffler, were Plaintiffs' "Plan Administrator and fiduciary and would take care of the operations of the Plans." (ECF No. 54 at 17). Plaintiffs contend that Edwards' signature as plan administrator shows effective control.

Plaintiffs assert that Defendants made "behind the scenes decisions about the operation of the Plans, including out of the ordinary, material decisions impacting the Plans, such as . . . changing . . . the benefit formula for the Plans in 2009 and 2010 without telling the [Plaintiffs] it was being done." (ECF No. 55 at 14).

Plaintiffs assert that Defendants' recommendation to terminate the Plan was a directive giving rise to functional fiduciary status. Plaintiffs assert that Defendants failed to inform Plaintiffs of material issues like the large overfund amounts, excise taxes, and

immediate vesting of employees, which "took away Plaintiff's ability to make a reasoned decision on their own." (ECF No. 54 at 14). Plaintiffs assert that Edwards exercised autonomy and authority over Plaintiffs' pension plans when continuing tasks related to the Plans' terminations after Huntting's passing.

## B. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A material fact is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The party moving for summary judgment "bears the burden of establishing the basis for its motion and identifying evidence that demonstrates the absence of a genuine issue of material fact." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *Celotex*, 477 U.S. at 323); s*ee also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The burden shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *see also Lannes v. Flowserve U.S., Inc.*, 628 F. App'x 957, 959 (9th Cir. 2015) ("[D]efendants shift[] the burden of demonstrating a material issue of fact by 'pointing out . . . that there is an absence of evidence to support the [plaintiffs'] case.'") (quoting *Celotex*, 477 U.S. at 325).

Courts must accept the "non-moving party's direct evidence as true, and generally may not disregard direct evidence on the basis that it is implausible or incredible." *Burchett v. Bromps*, 466 F. App'x 605, 606 (9th Cir. 2012) (citation omitted). The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See*

*Anderson*, 477 U.S. at 255; *see also Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (noting that "defeat[ing] summary judgment" requires "evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor") (internal quotation omitted). Conclusory allegations, however, are insufficient. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."). Instead, the nonmovant must designate which specific facts show a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

## C. ERISA Functional Fiduciary Law

ERISA provides a cause of action "for breach of fiduciary duty only against persons who act as a fiduciary with respect to a plan or trust covered by ERISA." *Acosta v. Pac. Enters.*, 950 F.2d 611, 617 (9th Cir. 1991); *see also Batchelor v. Oak Hill Med. Grp.*, 870 F.2d 1446, 1448 (9th Cir. 1989); *Nieto v. Ecker*, 845 F.2d 868, 871–73 (9th Cir. 1988). ERISA fiduciary liability can attach to a "named Trustee" designated in writing in the Plan Agreement. ERISA fiduciary liability can also attach to a person "who carries out fiduciary duties"—a "functional" fiduciary. *CSA 401(K) Plan v. Pension Prof'ls, Inc.*, 195 F.3d 1135, 1138 (9th Cir. 1999). A functional fiduciary carries out fiduciary duties as listed at 29 U.S.C. § 1002(21)(A):

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

The determination of functional fiduciary assesses whether the service provider "exercises discretionary authority or control respecting the management or administration of an employee benefit plan." *Kyle Rys., Inc. v. Pac. Admin. Servs., Inc.*, 990 F.2d 513,

516 (9th Cir. 1993). The inquiry focuses on the specific actions giving rise to the complaint, and analyzes whether those actions were fiduciary functions.

> In every case charging breach of ERISA fiduciary duty, the threshold question is not whether the actions of some person providing services under the plan adversely affected a beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also CSA 401(K)*, 195 F.3d at 1138 ("Fiduciary liability depends not on how one's duties are formally characterized . . . but rather upon functional terms of control and authority over the plan.") (citing *IT Corp. v. Gen. Am. Life Ins.*, 107 F.3d 1415, 1419 (9th Cir. 1997)). A party's fiduciary status under ERISA is a question of law if the facts are not in question. *See Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1458 (9th Cir. 1995) (stating "[t]he facts" relevant to the defendant's fiduciary status "are not in question here; it is purely a question of law that we must determine.").

Service providers who "perform ministerial services or administrative functions within a framework of policies, rules, and procedures established by others" lack "power to make decisions," and are not ERISA fiduciaries. *CSA 401(k)*, 195 F.3d at 1139. A third-party plan administrator who prepares financial reports performs a ministerial function. *Id.* An accountant who "review[s] the books, and prepare[s] financial statements and tax returns" for a plan performs ministerial functions. *Yeseta v. Baima*, 837 F.2d 380, 385 (1988); *see also Anoka Orthopaedic Assocs., P.A. v. Lechner*, 910 F.2d 514, 517 (8th Cir. 1990) ("The performance of ministerial functions, including the preparation of reports required by government agencies, does not entail discretionary authority or responsibility.").

In *IT Corp*, the Court of Appeals for the Ninth Circuit explained that calculating healthcare plan benefits "in accordance with a mathematical formula" is ministerial. 107 F.3d at 1420. The court explained that retirement benefit calculations may similarly be "in accordance with a mathematical formula," if the benefits "depend solely on date of birth,

date of entry into service, gross pay for last three years of service, and date of retirement." *Id.*; *see also Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1133 (10th Cir. 2005) (determining "preparers of plan financial documents" exercised no discretionary authority because "once the preparer has the necessary information, it is . . . pretty much a numbers calculation") (citations and quotation omitted).

A service provider required to "make[s] a decision in the exercise of a ministerial duty" does not exercise "the level of discretion required to be an ERISA fiduciary." *Ariz. State Carpenters Pension Tr. Fund v. Citibank*, 125 F.3d 715, 722 (9th Cir. 1997). A service provider's decisions regarding the information to collect and report, presentation of the information, and recipients of the information, "do not amount to an assumption of control or authority" within the meaning of the statute. *Id.*

Professional services give rise to fiduciary acts under ERISA only if the services exceed the scope of usual professional functions. "[A]ttorneys, accountants, actuaries, or consultants who perform their usual professional functions in rendering legal, accounting, actuarial, or consulting services to an employee benefit plan are not considered fiduciaries of the plan solely by virtue of rendering such services." *CSA 401(k)*, 195 F.3d at 1139 (discussing § 2509.75–5 of the Department of Labor Regulations). Professionals act as fiduciaries if they "step outside the scope of rendering administrative services and in fact exercise discretionary authority or control," *id.*, "in a manner other than by usual professional functions," *Yeseta v. Baima*, 837 F.2d 380, 385 (9th Cir. 1988); *see also Bozeman v. Provident Nat. Assur. Co.*, No. 90-2925-4, 1992 WL 328804, at *3 (W.D. Tenn. May 15, 1992) (concluding consultants did not "exercise[] an *unusual* degree of influence, transcend[] their role as consultants," or have discretion or control based on providing a broad range of services upon which the trustees relied). Functional fiduciary liability attaches to "[p]rofessional service providers . . . when they cross the line from adviser to fiduciary." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

Courts have imposed functional fiduciary liability when professional service providers exceed ministerial services or the scope of usual professional functions. For

example, a professional service provider who occupies a "position[] of trust and confidence" within a company may be a functional fiduciary. *Martin v. Feilin*, 965 F.2d 660, 669 (8th Cir. 1992). Functional fiduciary status has attached to service providers who have the ability to write checks or withdraw plan funds, *Coldesina*, 407 F.3d at 1133, *Yeseta*, 837 F.2d at 386; make plan-related communications to beneficiaries or the press, *Monson v. Century Mfg. Co.*, 739 F.2d 1293, 1303 (8th Cir. 1984), *Harold Ives Trucking Co. v. Spradley & Coker, Inc.*, 178 F.3d 523, 525–26 (8th Cir. 1999), *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 284 F. Supp. 2d 511, 661 (S.D. Tex. 2003); hire plan fiduciaries, *id.*; make coverage decisions, *Harold Ives*, 178 F.3d at 525–26; withhold material information, *In re Enron* 284 F. Supp. 2d at 661; and engage in self-dealing, *Martin*, 965 F.2d at 669, *Liss v. Smith*, 991 F. Supp. 278, 302 (S.D.N.Y. 1998).

Courts have not imposed functional fiduciary liability when professional service providers do not exceed ministerial services or the scope of usual professional functions. For example, a professional service provider does not act as a functional fiduciary for "counsel[ing] others in making withdrawals from the Plan," *Yeseta*, 837 F.2d at 385, or influencing a client's decisions, *see Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir. 1993) ("Mere influence over the trustee's investment decisions, however, is not effective control over plan assets."); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991) (concluding that the inquiry "speak[s] to actual decision-making power rather than to the influence that a professional may have over the decisions made by the plan trustees she advises"); *but see Rodriguez v. P.R. Marine Mgmt.*, 975 F. Supp. 115, 122 (D.P.R. 1997) (observing the possibility a reasonable jury could find a long-time benefits consultant exercised control over trustees who acted on the recommendation).

A service provider does not act as a fiduciary for failing to provide the client with information or high-quality services. *See Mertens v. Hewitt Assocs.*, 948 F.2d 607, 610 (9th Cir. 1991) ("Although the plaintiffs allege that Hewitt acted negligently, fraudulently, and reprehensibly as an actuary, no inference can be made from the complaint that Hewitt acted in any capacity other than as an actuary."); *Kyle*, 990 F.2d at 516 ("[A]lleged

negligence in following the Plan does not change the fact that [the administrator] was still obligated to follow the Plan and that [the employer] retained ultimate responsibility . . . for all claims made under the Plan"); *IT Corp.*, 107 F.3d at 1421 ("The power to err, as when a clerical employee types an erroneous code onto a computer screen, is not the kind of discretionary authority which turns an administrator into a fiduciary."); *Pappas*, 923 F.2d at 538 (concealing funding shortages, improperly advising plan trustee, and failing to reveal "reasoning behind actuarial assumptions and methodologies" did not make plan advisors functional fiduciaries).

A service provider does not act as a fiduciary for conditioning further services on the client implementing a recommendation if the client is "free to accept or reject [the] condition" and has "the option of retaining another third-party administrator." *CSA 401(k)*, 195 F.3d at 1139 (explaining the service provider's condition "assert[s] control over its own engagement" but does not force the trustee to relinquish "discretion and decision-making power").

### D. Discussion

The evidence in the record shows that Keller and Mozafari were the only named trustees. Keller and Mozafari had exclusive check-writing power. Plaintiffs continued to possess the ability to accept or reject Huntting's recommendations at all times. Sheffler engaged in ministerial tasks regarding annual funding recommendations by making actuarial calculations and preparing financial reports and filings. Edwards was an at-will employee, and provided ministerial actuarial and third-party administrative assistance to the Plans at the instruction of Huntting or Sheffler. Keller and Mozafari paid Defendants for actuarial services and annual government-required filings for the Plan. Defendants have come forward with evidence that they performed services within the scope of usual professional conduct. *See CSA 401(k)*, 195 F.3d at 1139; *Yeseta*, 837 F.2d at 385; *Anoka*, 910 F.2d at 517; *see also IT Corp*, 107 F.3d at 1420; *Coldesina*, 407 F.3d at 1133.

The burden shifts to Plaintiffs to identify specific facts that show a genuine issue for trial. *See Anderson*, 477 U.S. at 256. Plaintiffs contend that there are genuine issues of

material fact regarding Defendants' effective control over the Plans, shown by Defendants' superior knowledge and expertise, failure to inform Plaintiffs of benefit formula changes, and failure to inform Plaintiffs of consequences or alternatives to plan termination.

In this case, the specific actions subject to complaint are (1) recommendations for annual Plan contributions without informing Plaintiffs of "annual funding amendments re benefit calculations" and overfunding (ECF No. 54 at 14), (2) benefit formula changes for 2009 and 2010, and (3) recommendations for plan termination and rollover without informing Plaintiffs of the amount of overfunding, alternative options, excise taxes, or immediate employee vesting. *See Pegram*, 530 U.S. at 226 ("[T]he threshold question is . . . whether . . . that person was acting as a fiduciary . . . when taking the action subject to complaint.").

Plaintiffs provide declarations in support of the assertion that Defendants' superior knowledge and expertise gave them effective control over annual Plan contributions for purposes of functional fiduciary liability. Plaintiffs state that they told Huntting they "did not know anything about retirement plans," and "needed someone to make sure that the Plans were always handled right." (Mozafari Decl. ¶ 7, ECF No. 55-2).[7] Plaintiffs state that Huntting "seemed experienced" and "we relied on what Mr. Huntting told us to do." *Id.* ¶ 7, 14. Plaintiffs state that Huntting represented, "'I am your Plan Administrator and fiduciary,' and that he and his team (which included Sheffler and ultimately Edwards) would take care of us and the day-to-day operation of the Plans." *Id.* ¶ 12. Plaintiffs state that Huntting "directed us to specific mutual funds to invest in." (ECF No. 55-2 ¶ 10). Plaintiffs provide a letter to the Internal Revenue Service regarding a late Plan filing, signed by Edwards as "Plan Administrator." (Ex. 1 to Mozafari Decl., ECF 55-3 at 2). Plaintiffs provide a 2010 Schedule SB filing signed by Sheffler as the "Enrolled Actuary" of the Plan. (Ex. 13 to Keller Decl., ECF No. 55-5 at 29).

---

[7] The Keller declaration is identical in relevant part. (ECF No. 55-4).

16cv2644-WQH-MSB

Plaintiffs provide emails from Huntting indicating appropriate annual Plan contributions. *See* Ex. 5 to Keller Decl., at *supra* Section II ("[Y]ou could contribute up to an additional $184,000 to your pension plan and Borna could contribute up to an additional $142,000 to his plan. . . . I must limit the contribution to the Cheap Easy On-Line Traffic School Pension plan for 2010 to $57,300"). Plaintiffs state in declarations that they "followed Mr. Huntting's instructions relative to contribution amounts." (Mozafari Decl. ¶ 22, ECF No. 55-2). Plaintiffs state that "[i]f [Huntting] told us the specific number to contribute, we contributed that number. If he told us to contribute the maximum in the range, we would. If he did not restrict the amount to contribute then we contributed the maximum in the range" because, in previous conversations with Huntting, "he told me that we could contribute the maximum unless he told us otherwise." *Id.*

The evidence in the record shows that Defendants provided Plaintiffs with annual funding recommendations. Defendants performed third-party actuarial, administrative, and consulting services. Defendants prepared and filed government-required filings.

The evidence in the record shows that Defendants were not insiders, did not have check-writing authority or access to plan assets, and did not engage in self-dealing. Plaintiffs provide no evidence of payments for investment advice to any Defendant. Defendants did not hold a position of trust and confidence. *See, e.g.*, *Martin* (determining company insider accountants with "expertise in accounting and employee benefits law" exceeded normal professional role for "recommend[ing] transactions, structur[ing] deals, and provid[ing] investment advice" when they stood to gain personally).

Defendants' superior knowledge does not give rise to ERISA functional fiduciary liability, even if Defendants provided insufficient information and poor advice. *See, e.g.*, *Citibank*, 125 F. 3d at 722; *Kyle*, 990 F.2d at 516; *Mertens*, 948 F.2d at 610; *see also Pappas*, 923 F.2d at 538 (disagreeing "that consultants become fiduciaries when they perform professional functions in a tortious manner, regardless of what capacity they are acting in when their tortious deeds occur"). Defendants' verbal and written representations that any Defendant was a Plan administrator, actuary, or fiduciary, do not control the

ERISA functional fiduciary inquiry. *CSA 401(K)*, 195 F.3d at 1138 (noting the inquiry does not turn on how the person's "duties are formally characterized") (citing *IT Corp.*, 107 F.3d at 1419). Plaintiffs have not come forward with evidence to show that Defendants' superior knowledge and expertise supports functional fiduciary liability.

Plaintiffs provide declarations in support of the assertion that 2009 and 2010 changes to the benefit formula gave Defendants effective control over the Plans for purposes of functional fiduciary liability. Plaintiffs state that Sheffler and Huntting "made a decision to amend the CEOTS Pension Plan to change the benefit formula in 2009 and 2010." (ECF No. 55-2 ¶ 23). Plaintiffs state that "[t]here were no discussions regarding these changes with [Plaintiffs]" and that Plaintiffs "have never seen Amendments for these changes." *Id.* Plaintiffs provide a September 29, 2010 email from Sheffler to Huntting:

> [W]e need an amendment to get the $175k deducted.
> Currently we are @ $166k. But the formula accruals are less than the grandfathered ace benefit due to the NRA 62 change.
> 2 terminated ees would be affected. - may i proceed? do you want to see the workup before we finalize?
> ps the plan is overfunded and would need an amendment next year to get ANY deduction.

(Ex. 15 to Horton Decl., ECF 55-7 at 2). The next day Huntting responded, "Go ahead. Let me know what we need to do in 2010." *Id.* Plaintiffs provide copies of the 2009 and 2010 Schedule SBs. *Id.*

The evidence in the record shows that the 2009 Schedule SB and the 2010 Schedule SB were attachments to the 2009 Form 5500-SF and 2010 Form 5500-SF. (Exs. 12–13 to Keller Decl., ECF 54-5 at 27, 29). Plaintiffs signed the 2009 Form 5500-SF. (Ex. 19 to Sheffler Decl., ECF No. 46-22 at 3). Huntting and Sheffler prepared and filed 2009 and 2010 government-required forms on behalf of the Plans, which is not a fiduciary act. *See Yeseta*, 837 F.2d at 385; *Anoka*, 910 F.2d at 517. Defendants failing to disclose assumptions underlying the numbers in the 2009 and 2010 filings, *see Citibank*, 125 F. 3d at 722, or failing to use correct assumptions, *see IT Corp.*, 107 F.3d at 1421, does not give

rise to functional fiduciary status. Even if the filings were prepared to reflect an amendment to the Plans, the evidence shows that only Plaintiffs had the power or authority to effectuate changes to the Plans. (Ex. 18 to Sheffler Decl. at 2; ECF No. 46-21) (approving Board resolutions, including "the attached 2009 Interim Amendment to adopt certain provisions of the Pension Protection Act of 2006," signed by Mozafari). Plaintiffs have not come forward with evidence to show that Defendants' conduct related to 2009 or 2010 Plan amendments exceeded the scope of usual professional functions in support of functional fiduciary liability.

Plaintiffs provide declarations in support of the assertion that Defendants' failure to explain consequences or alternatives to Plan termination gave Defendants effective control over the Plans for purposes of functional fiduciary liability. Plaintiffs state,

> 25. We met with Mr. Huntting at Huntting's office on November 4, 2014. He told us that our plans were overfunded. He said that he and Mr. Sheffler had determined that because of the overfunding both Defined Benefit Plans needed to be terminated and the assets rolled over into the CEOTS PSP and the Marla Keller 401(k) Plan, and that it needed to happen immediately.

> 26. At the meeting, Mr. Huntting provided very little detail about the action plan he presented, other than that the termination of the Defined Benefit Plans and the rollovers of the funds would take care of the overfunding problem for each Defined Benefit Plan. Termination of the Defined Benefit Plans and rollover of the assets to the Defined Contribution Plans was presented to us as the only option, and what needed to happen. We were not told the amount of the overfunding, the fact that there would be excise tax consequences, or that employees who otherwise would not have vested, would immediately become 100% vested and be entitled to distributions from the terminated plans. Mr. Huntting did not tell us that we could, or should, seek a favorable Letter of Termination from the IRS. Mr. Huntting did not tell us the criteria for a Qualified Replacement Plan. We did not know to ask about any of these details, because we are not retirement plan professionals, and were relying upon Mr. Huntting and his team, who we had hired to create and administer the Plans.

> 27. At the meeting, Mr. Huntting presented to us for signature Corporate Resolutions he had pre-prepared authorizing termination of the Plans.

28. We relied upon Mr. Huntting as our Plan Administrator and fiduciary that he and his team were making the right decision for us, and signed the Resolutions, as well as all the termination paperwork that was provided by Mr. Huntting and Mr. Edwards.

29. After the meeting, I received a letter dated November 4, 2014 from Mr. Huntting, stating the need to terminate the Defined Benefit Plans and roll the assets over into the Defined Contribution Plans. The letter did not provide other options to termination, or identify consequences such as excise taxes that would be caused if the Defined Benefit Plans were terminated . . . .

(ECF No. 55-2 ¶¶ 25–29). Mozafari and Keller state they continued the pension plan terminations after Huntting passed, relying on instructions from Edwards. *Id.* ¶¶ 31–33.

The evidence in the record shows that Defendants' involvement in the decision to terminate the Plans did not go beyond the scope of usual professional conduct. Huntting's November 4, 2014 letter explains the consequences of not terminating the plan. Huntting's prediction of negative consequences, in the event Plaintiffs did not accept his recommendation, was not a directive and did not deprive Plaintiffs of a meaningful choice for purposes of ERISA fiduciary status. *CSA 401(k)*, 195 F.3d at 1139 (explaining the trustee "was free to accept or reject [the] condition" and "had the option of retaining another third-party administrator"). Defendants providing deficient information at any stage of the Plan, including termination, goes to the quality of advice, not ERISA fiduciary liability. *See Citibank*, 125 F. 3d at 722; *Mertens*, 948 F.2d at 610; *Pappas*, 923 F.2d at 538. Plaintiffs have not come forward with evidence to show that Defendants' conduct related to Plan termination exceeded the scope of usual professional conduct in support of functional fiduciary liability.

Plaintiffs' evidence does not create a genuine issue of fact as to whether Defendants had "any control respecting the management of the plan or its assets, g[a]ve investment advice for a fee, or ha[d] discretionary responsibility in the administration of the plan.'"

*CSA 401(k)*, 195 F.3d at 1139.[8]  The Court finds no genuine issues of material fact exist as to ERISA functional fiduciary liability.  The Court finds that summary judgment is appropriate in favor of Defendants as to the ERISA cause of action.

## IV.    EGPS MOTION FOR SUMMARY JUDGMENT (ECF No. 50)

EGPS contends that it is entitled to summary judgment because liability for Plaintiffs' claims cannot be imposed on EGPS as successor to Sheffler's businesses.  (ECF No. 50-1 at 5).  EGPS asserts that it purchased substantially all of the assets of Sheffler's businesses on July 25, 2016, agreeing that sellers would remain obligated as to liabilities accrued before that date.  EGPS asserts that Plaintiffs' claims in this action are based on conduct that occurred before July 25, 2016 and that EGPS did not expressly or impliedly agree to an assumption of the liability for these claims.

Plaintiffs contend that there are genuine issues of material fact regarding whether EGPS has successor liability.  (ECF No. 57 at 11).  Plaintiffs contend that section 2.1(c) of the APA contains an express assumption of liabilities, according to standard rules of English and grammar.  (ECF No. 57 at 8).  Plaintiffs assert that the APA excludes liabilities accrued before the closing date, with the exception of liabilities caused by breach.

---

[8] Knauer states that she is an attorney and principal at Integrated Retirement Plan Solutions who was "retained to evaluate the liability of Defendants . . . and damages to Plaintiffs in this matter."  *Id.* at 2. Knauer states that she reviewed "pertinent documents produced by the parties and deposition transcripts," and "conclude[d] that pursuant to the function test of ERISA 3(21)(A) that the Defendants acted as Plan fiduciaries."  *Id.* at 6.  Knauer states that "the actions [Defendants] took went well beyond ministerial, and evidence a level of control and decision-making in the management, administration, disposition of assets, and termination of the Plans."  *Id.* at 6–7.  Plaintiffs assert that the Court is bound to follow Knauer's opinion at the summary judgment stage.  (ECF No. 71 at 3–4).  Defendants object to this declaration on the grounds that Knauer is not a qualified expert, lacks foundation, and states inadmissible legal opinions under the Federal Rules of Evidence.  (ECF Nos. 61, 63, 65, 67).

The Court considers only admissible evidence on summary judgment motions.  *Ballen*, 466 F.3d at 745 (citing *Orr*, 285 F.3d at 773).  Knauer's declaration raises no issues of fact.  Knaeur concludes that Defendants acted as fiduciaries, and labels Defendants' actions regarding the plan as "control and decision-making" rather than "ministerial."  Issues of law are the "distinct and exclusive province of the trial judge."  *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)).  Defendants' objections are sustained.

Plaintiffs contend that the sale to EGPS amounts to merger or consolidation. Plaintiffs contend that EGPS is a mere continuation of Sheffler's businesses. Plaintiffs contend that EGPS is directly liable for the state law causes of action.

Under California law, a corporation purchasing the assets of another corporation may assume the liabilities of the selling corporation if one of four exceptions applies.

> The purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

*Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977); *see also Petrini v. Mohasco Corp.*, 71 Cal. Rptr. 2d 910, 912 (Ct. App. 1998). Absent underlying ERISA liability as to Huntting, Sheffler, or Edwards, the Court finds no ERISA liability could attach to EGPS. The Court does not reach issues related to exceptions under *Ray*. The Court finds that summary judgment is appropriate in favor of EGPS as to the ERISA cause of action.

## V.    SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS

Defendants move the Court to dismiss the pendent state law claims in the event the Court grants summary judgment as to the first claim for breach of fiduciary duty under ERISA. (ECF Nos. 46-1, 47-1, 48-1 at 26-27; ECF No. 50-1 at 18-19). Plaintiffs contend that judicial economy requires this matter to proceed because of the length of time the matter has been proceeding and already incurred costs. (ECF Nos. 59 at 17; 57 at 12-13).

In this case, Plaintiffs assert that this Court properly has jurisdiction based on federal question jurisdiction over the ERISA. The federal supplemental jurisdiction statute provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c). Having dismissed the only federal claim asserted by Plaintiffs against Defendants, the Court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c). *See San Pedro Hotel Co., Inc. v. City of L.A.*, 159 F.3d 470, 478 (9th Cir. 1998) (upholding district court declining to exercise supplemental jurisdiction and requiring no further explanation by district courts acting in accordance with 28 U.S.C. § 1367(c)(3)); *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) ("The decision whether to continue to exercise supplemental jurisdiction over state law claims after all federal claims have been dismissed lies within the district court's discretion.") (quoting *Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007)).

## VI. CONCLUSION

IT IS HEREBY ORDERED that Defendants' motions for summary judgment (ECF Nos. 46, 47, 48, 50) are granted. Any motions to file an amended complaint must be filed within thirty (30) days of the date of this Order in accordance with Local Rule 7.1.

Dated: December 13, 2018

Hon. William Q. Hayes
United States District Court

16cv2644-WQH-MSB